Fernando Sierra Berdecía, Secretario del Trabajo del Estado Libre Asociado de Puerto Rico en representación y para beneficio del obrero Eduardo Castellar, demandante y recurrido, *v.* Mario Mercado e Hijos, demandada y recurrente.

Número 11991.

*Reasignado:* 9 de enero de 1959. *Resuelto:* 14 de mayo de 1959.

*Pedro M. Porrata* y *Charles R. Cuprill,* abogado de la recurrente;. *Domingo Candelario* y *Carlos Bastián Ramos,* abogado del recurrido y del Departamento del Trabajo.

EL JUEZ ASOCIADO SEÑOR SALDAÑA emitió la opinión del Tribunal.

Se trata de un pleito sobre reclamáción de salarios por horas extras de trabajo. En síntesis, a base de las pruebas.

practicadas en el juicio, el Tribunal Superior llegó a las siguientes conclusiones de hecho: 1ª El demandante Castellar trabajó para la Sociedad Agrícola Mario Mercado e Hijos ininterrumpidamente en distintas fincas de cañas de azúcar durante el período comprendido entre 9 de julio de 1942 y 8 de abril de 1953; 2ª La labor principal del demandante desde el 9 de julio de 1942 hasta el 27 de abril de 1949 fue la de "listero", aunque su tarea también incluía voltear las fincas y cobrar los cánones de casas y solares pertenecientes a la demandada; 3ª Desde el 28 de abril de 1949 hasta el 8 de abril de 1953, el demandante ". . . continuó trabajando para la demandada bajo el mismo contrato anterior de prestación de servicios, pero ocupando el cargo de superintendente de la Hacienda Buena Vista, propiedad de la demandada . . ."; 4ª Con excepción de dos semanas en que estuvo ausente por enfermedad, las horas de trabajo de Castellar fueron siempre: nueve horas durante cada día de la semana hasta el 11 de abril de 1946, y, desde esa fecha en adelante, nueve horas en los días laborables y tres horas en los días de descanso; y por último, 5ª Castellar devengó un sueldo semanal que fue aumentando desde $10 en 1942 hasta $23 en 1953, pero la demandada nunca le pagó las horas extras trabajadas.[1]

Por otra parte, como conclusiones de derecho, el tribunal de instancia hizo constar: (1) que el Decreto Mandatorio núm. 3 de la Junta de Salario Mínimo era aplicable a las labores que realizó Castellar para la demandada como listero; (2) que el 28 de abril de 1949, cuando empezó a trabajar como superintendente de la Hacienda Buena Vista, Castellar se convirtió en un "ejecutivo" según la doctrina sentada en *Correa* v. *Mario Mercado e Hijos*, 72 D.P.R. 80 (1951); y (3) que al entrar en vigor el Reglamento núm. 13 de la Junta

---

[1] El salario semanal fue de $10 desde el 9 de julio de 1942 hasta el 1 de octubre de 1942; de $12.50 desde el 2 de octubre de 1942 hasta el 27 de mayo de 1943; de $14 desde el 28 de mayo de 1943 hasta el 16 de enero de 1946; de $17.50 desde el 17 de enero de 1946 hasta el 2 de abril de 1947; de $20 desde el 3 de abril de 1947 hasta el 21 de enero de 1953; y de $23 desde el 22 de enero de 1953 hasta el 8 de abril del mismo año.

de Salario Mínimo, esto es, el 15 de enero de 1952, Castellar dejó de ser un "ejecutivo", pues recibía un salario semanal menor de $30.(²)   En consecuencia, eliminó de la reclamación todas las horas extras trabajadas durante el período comprendido entre el 28 de abril de 1949 y el 15 de enero de 1952. Pero concedió al demandante un total de $1,717.04 por el período en que trabajó como listero, computando las horas extras a razón del tipo de salario correspondiente y aplicando la Ley núm. 49 de 1935, el Decreto Mandatorio núm. 3 de Salario Mínimo y la Ley núm. 289 de 1946.   Y además concedió al demandante un total de $498.48 por las horas extras trabajadas como superintendente desde 15 de enero de 1952 hasta 8 de abril de 1953, aplicando a este período el Decreto núm. 3 y la Ley núm. 289 de 1946.   Por eso, en definitiva, dictó sentencia condenando a la demandada a pagar la suma de $2,209.52 a Castellar, más otra cantidad igual por concepto de la penalidad o liquidación de daños que fija la ley.   Contra dicha sentencia interpuso Mario Mercado e Hijos el presente recurso y en su alegato imputa al tribunal a quo la comisión de siete errores.

■ La demandada sostiene, en primer lugar, que las disposiciones del Decreto núm. 3 son inaplicables a las labores que realizó Castellar como "listero".   No tiene razón.   Castellar era un empleado en la fase agrícola de la industria azucarera, a tenor con lo dispuesto en el párrafo C-3 del Decreto que define la fase agrícola de la producción de caña de azúcar como sigue: "La preparación del terreno, la siembra, cultivo, recolección, transporte de caña cuando sea hecho por agricultores, y cualquier otra operación de naturaleza agrícola." Según demostró la prueba, la tarea de Castellar consistía en

(²) El Reglamento núm. 13 define los términos "ejecutivo", "administrador" y "profesional" que fueron excluídos del alcance de la Ley de Salario Mínimo en virtud de la Ley núm. 131 de 27 de abril de 1950 (Leyes, pág. 337).   Entre los requisitos para calificar como "ejecutivo" establece que el empleado debe recibir por sus servicios ". . . una compensación fija (por día, semana, quincena o períodos mayores) equivalente a un salario semanal no menor de $30, excluyendo alimentos, vivienda u otros servicios."

318

voltear varias veces al día las piezas de caña en la finca para comprobar personalmente qué obreros estaban trabajando, qué labores llevaban a cabo y cuántas horas de trabajo habían realizado. Apuntaba los nombres de los trabajadores, la clase de trabajo que realizaban, y el número de horas trabajadas. Luego hacía en una oficina de la demandada el informe o "parte" diario y también preparaba las nóminas de pago de los trabajadores. Carecía de facultad para contratar y para despedir empleados, pues esta función correspondía al mayordomo. No tenía bajo sus órdenes ni dirigía las labores de ningún otro empleado de la demandada. Ni siquiera tenía discreción para distribuir o asignar labores a otras personas que en el campo o en las oficinas trabajaban al servicio de la demandada. Más aún: sólo desempeñaba tareas rutinarias que no exigían el ejercicio de discreción o de juicio independiente. Por tanto, aunque no se menciona específicamente en el apartado A-1 del Decreto núm. 3, su ocupación de "listero" está comprendida en la cláusula general de ese apartado que se refiere a "toda clase de trabajo" en la fase agrícola de la industria del azúcar.([3])

_____

([3]) Refiriéndose a los salarios mínimos y a las horas de labor en la "fase agrícola" de la industria del azúcar, el apartado A del Decreto núm. 3 dispone:

"1. Salarios Mínimos.—Todo patrono que emplee trabajadores en la fase agrícola de la industria del azúcar vendrá obligado a pagarle a los mismos por lo menos a razón de los siguientes tipos de salarios para las distintas ocupaciones o trabajos detallados a continuación por las primeras ocho (8) horas de trabajo realizadas en cualquier período de veinticuatro (24) horas, con excepción de aquéllos que trabajen como zanjeros, limpiadores de zanjas, chapodeadores y limpiadores de caños con machete y hacheros limpiando traviesas dentro del agua, y regadores, en sistema de riego que no son por gravedad, cuando trabajan dentro del agua, a los cuales el tipo de salario mínimo diario aplicable será por las primeras siete (7) horas de trabajo realizado durante cualquier período de veinticuatro (24) horas:

| Ocupación | Tipos para Fincas no Pequeñas o que no sean del Interior | Tipos para Fincas Pequeñas o del Interior |
|---|---|---|
| (a) Toda clase de trabajo excepto los abajo clasificados............................. | $1.50 | $1.40 |

A idéntica conclusión llegamos al analizar las labores de otro "listero" en *Tulier* v. *Autoridad de Tierras*, 70 D.P.R. 267 (1949). Posteriormente excluímos de la referida cláusula general a los mayordomos que tienen bajo sus órdenes, dirigen, supervisan y pueden emplear o despedir a los demás obreros agrícolas cuyas ocupaciones se enumeran expresamente en el apartado A-1 del Decreto. Véase *Correa* v. *Mario Mercado e Hijos*, 72 D.P.R. 80 (1951). Pero la exclusión de los mayordomos se debió a que ". . . *a nuestro juicio no fue la intención de la Junta de Salario Mínimo incluir en esta cláusula general a los mayordomos, sencillamente porque no*

| | | |
|---|---|---|
| (b) Zanjeros; limpiadores de zanjas; hacheros en zanjas; chapodeadores; regadores en sistemas de riego que no son por gravedad, cuando trabajen dentro del agua o en terrenos pantanosos; operadores de bombas | 1.70 | 1.55 |
| (c) Cortadores de caña; grueros; emburradores; timoneros; y llenadores de carros de caña. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.80 | 1.65 |
| (d) Carreteros en recolección; plancheros; llenadores de vagones; y conductores de vagones. . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.90 | 1.75 |
| (e) Operadores de tractores. . . . . . . . . . . . . . . . | 2.20 | 2.05 |
| (f) Auxiliares de carpinteros; albañiles; mecánicos; pintores; electricistas y de otros obreros de artes y oficios. . . . . . . . . . . . . . . | 2.40 | 2.20 |
| (g) Carpinteros; albañiles; mecánicos; pintores; electricistas y otros obreros de artes y oficios. . . . . . . . . . . . . . . . . . . . . . . . . | 3.25 | 3.00 |

4. Horas de Labor:

(a) Máximo de horas de trabajo diarias

Ningún patrono empleará a trabajador alguno en la fase agrícola de la industria del azúcar, por más de ocho (8) horas en cualquier período de veinticuatro (24) horas a menos que dicho trabajador reciba compensación por su trabajo en exceso de dichas ocho (8) horas a razón de tiempo doble el tipo mínimo de salario aplicable de acuerdo con la escala establecida en el apartado A-1 de este Decreto; Disponiéndose, además, que los zanjeros y chapodeadores, y los regadores que trabajan en sistemas de riego que no son por gravedad, limpiadores de caños con machete y hacheros limpiando traviesas dentro del agua, no podrán ser empleados por más de siete (7) horas en cualquier período de veinticuatro (24) horas, a menos que dichos trabajadores reciban compensación por su trabajo en exceso de dichas siete (7) horas a razón de tiempo doble el tipo mínimo de salario aplicable de acuerdo con la escala establecida en el apartado A-1 de este Decreto."

*obstante la relativa importancia del trabajo que ellos realizan, les estaría fijando un salario mínimo inferior al de los obreros que trabajan a sus órdenes . . .*" Ibid., pág. 87. (Bastardillas nuestras.) Cf. *De Arteaga* v. *Club Deportivo*, 73 D.P.R. 444 (1952). Obviamente esta razón no puede invocarse aquí. Basta recordar la naturaleza de las tareas que Castellar realizaba como listero para convencerse de ello. En consecuencia, ratificamos una vez más la regla sentada en el caso de *Tulier*, supra: el Decreto núm. 3 cubre las labores que tradicionalmente realizan los listeros en la fase agrícola de la industria azucarera.

■ En el segundo señalamiento de error se impugna la determinación de que Castellar dejó de ser un "ejecutivo" al entrar en vigor el Reglamento núm. 13 de la Junta de Salario Mínimo. Ya señalamos que la Ley núm. 131 de 1950 (Leyes, pág. 337) enmendó la sec. 30 de la Ley de Salario Mínimo para establecer como norma uniforme y general que los "profesionales, ejecutivos y administradores" no tendrían derecho a los beneficios fijados por la Junta en sus decretos respecto a salarios, horas de labor y otras condiciones de trabajo. A la inversa, todos los demás obreros, empleados o trabajadores quedaron incluídos sin excepción en la categoría de personas con derecho a recibir los referidos beneficios que la Junta había fijado o en el futuro fijaría en sus decretos. Ahora bien, se delegó a la Junta la facultad de definir mediante decreto o reglamento el significado de los términos "profesional, ejecutivo y administrador". Y en el art. 1 del Reglamento núm. 13, que empezó a regir el 15 de enero de 1952, la Junta de Salario Mínimo adoptó la siguiente definición del término "ejecutivo":

"(*a*) Cualquier empleado (1) cuyo deber primordial consista en la dirección de la empresa en que trabaja o en la dirección de un habitualmente reconocido departamento o subdivisión de la empresa; y

(2) que habitual y regularmente dirija el trabajo de otros dos o más empleados de la empresa o de tal departamento o subdivisión de la empresa; y

(3) que tenga la autoridad de emplear y despedir otros empleados o cuyas sugestiones y recomendaciones sobre el empleo y despido de otros empleados y en cuanto al mejoramiento y ascenso o en relación con cualquier otro cambio de status de otros empleados hayan de recibir especial atención; y

(4) que habitual y regularmente ejerza facultades discrecionales; y

(5) que no dedique más del 20% de las horas trabajadas en la semana de labor a actividades que no estén directa e íntimamente relacionadas con el desempeño del trabajo descrito en el párrafo (a), incisos (1) al (4) de este artículo; *Disponiéndose* que este inciso (5) no será aplicable en el caso de un empleado que esté él solo a cargo de un establecimiento independiente o de una rama del establecimiento físicamente separado del mismo, o que sea dueño de por lo menos el 20% del interés de la empresa en que esté empleado; y

(6) que reciba por sus servicios una compensación fija (por día, semana, quincena o períodos mayores) equivalente a un salario semanal no menor de $30.00, excluyendo alimentos, vivienda u otros servicios; o

(B) Cualquier empleado (1) cuyo trabajo cumpla con los requisitos dispuestos en el párrafo (a), inciso (1) y (2) de este artículo; y

(2) que reciba por sus servicios una compensación fija (por día, semana, quincena o períodos mayores) equivalentes a un salario semanal no menor de $100, excluyendo alimentos, vivienda u otros servicios." (⁴)

Así pues, Castellar no podía calificar como un "ejecutivo" durante el período comprendido entre 15 de enero de 1952 y 8 de abril de 1953. Recuérdese que entonces trabajaba como superintendente de la Hacienda Buena Vista. Aún supo-

---

(⁴) Mediante un reglamento que también comenzó a regir el 15 de enero de 1952, el Secretario del Trabajo adoptó una definición idéntica del término "ejecutivo" a los fines de la exclusión que se establece en el art. 19 de la Ley núm. 379 de 15 de mayo de 1948 (Leyes, pág. 1255) y en la sec. 5 de la Ley núm. 289 de 9 de abril de 1946 (Leyes, pág. 683), según fue enmendada por la Ley núm. 130 de 27 de abril de 1950 (Leyes, pág. 337). Véanse 29 L.P.R.A. secs. 271–288 y 295–299.

niendo que en el desempeño de ese cargo cumplía con los demás requisitos impuestos por el Reglamento núm. 13, es un hecho incontrovertido que recibía un salario semanal menor de $30. Esto basta para clasificarlo como un obrero o empleado con derecho a recibir paga doble (1) por horas trabajadas en exceso de ocho durante cualquier período de 24 horas, al amparo del Decreto núm. 3; y (2) por trabajos realizados durante el día de descanso, al amparo de la Ley núm. 289 de 1946.

■ La demandada arguye que el Reglamento núm. 13 es nulo porque al definir el término "ejecutivo" impone como condición esencial que el empleado reciba por sus servicios una compensación fija equivalente a un salario semanal no menor de $30, excluyendo alimentos, vivienda u otros servicios. Alega que el salario devengado por el empleado "puede ser un índice en unión a las otras características enumeradas [en el Reglamento], pero nunca un requisito aislado y excluyente", por lo cual la condición referente al salario semanal resulta arbitraria e ilegal. A nuestro juicio su contención carece de méritos. Sin duda, la naturaleza del trabajo que desempeña el empleado constituye el criterio principal para determinar si en verdad ejerce funciones ejecutivas. Por esta razón el Reglamento núm. 13, entre otros requisitos, incluye los siguientes: (1) que el "deber primordial [del empleado] consista en la dirección de la empresa . . . o de un . . . departamento o subdivisión de la empresa"; y (2) que el empleado "habitual regularmente dirija el trabajo de otros dos o más empleados de la empresa o de tal departamento o subdivisión de la empresa". No es menos cierto, sin embargo, que en la inmensa mayoría de los casos los ejecutivos tienen más responsabilidades y reciben mejores salarios que los demás empleados subalternos. De ahí que la compensación devengada constituya un criterio adecuado para determinar si en verdad un empleado ejerce funciones ejecutivas. Ciertamente no parece arbitrario ni tampoco irrazonable exigir, como condición *sine qua non* para que un empleado sea un "ejecutivo", que

éste reciba una compensación fija equivalente a un salario semanal no menor de $30, excluyendo alimentos, vivienda u otros servicios. Véanse *Sun Pub. Co.* v. *Walling*, 140 F.2d 445, 449 (6th Cir. 1944) y *Walling* v. *Yeakley*, 140 F.2d 830, 832–833 (10th Cir. 1944).

Por lo demás, ésta es ya una cuestión trillada en el derecho administrativo. Nadie puede ignorar que desde 1940 existe un reglamento administrativo federal que define el significado de los términos "ejecutivos, profesionales y administradores" bajo la Ley de Normas Razonables de Trabajo. 52 Stat. 1060, 29 U.S.C. secs. 201 y sigtes. Estas tres categorías de empleados están exentas de las disposiciones sobre salarios mínimos y paga por horas extras a tenor con lo dispuesto en la sec. 13(*a*)(1) de esa Ley Federal, pero allí específicamente se dispone que los referidos términos serán "definidos y delimitados mediante reglamentos promulgados por el Administrador de Horas y Salarios." Las disposiciones del reglamento federal sobre esta materia son muy parecidas a las que contiene el Reglamento núm. 13 de la Junta de Salario Mínimo. Véase 5 F. R. 4077; 14 F. R. 7705; 29 C.F.R. secs. 541.1–541.6. Ahora bien, el reglamento federal siempre ha exigido, como condición *sine qua non* para tener la calidad de "ejecutivo", que el empleado reciba cierta compensación fija por sus servicios: hoy día el salario semanal devengado no puede ser menor de $55 para Puerto Rico e Islas Vírgenes. Véase 3 *C.C.H. Labor Law Reporter*, secs. 23,301 y sigtes. Y la jurisprudencia reiterada de los tribunales reconoce que todas las disposiciones del reglamento federal son válidas, tanto desde el punto de vista legal como desde el punto de vista constitucional. Véanse *Fanelli* v. *United States Gypsum Co.*, 141 F.2d 216 (2d Cir. 1944); *Sun Pub. Co.* v. *Walling*, 140 F.2d 445, 449 (6th Cir. 1944); *Walling* v. *Yeakley*, 140 F.2d 830, 832–33 (10th Cir. 1944); 3 *C.C.H. Labor Law Reporter*, sec. 25,210 y los casos allí citados. Así se comprueba fácilmente que es ilusorio el intento de impugnar la validez

del Reglamento núm. 13 de la Junta de Salario Mínimo.(⁵)

■■ Los señalamientos de error núms. 3 y 4 se relacionan con la defensa de prescripción que la demandada planteó ante el Tribunal Superior. Allí se suscitó el punto de que la reclamación de Castellar por el período en que trabajó como "listero" (9 de julio de 1942 hasta 27 de abril de 1949) había prescrito a tenor de lo dispuesto en el art. 1867 del Código Civil (ed. 1930). 31 L.P.R.A. sec. 5297.(⁶) Castellar empezó a ocupar el cargo de "superintendente" de la Hacienda Buena Vista el 28 de abril de 1949 y la demanda original se radicó en este pleito con fecha 19 de enero de 1955. La cuestión se reducía, pues, a determinar si la naturaleza de los servicios que Castellar venía prestando a la demandada como listero varió fundamentalmente cuando éste pasó a ocupar el cargo de "superintendente" de la Hacienda Buena Vista. En efecto, hemos resuelto repetidamente que el término de tres años provisto en el inciso 3 del art. 1867 del Código Civil,

---

(⁵) Tampoco puede haber duda en cuanto a la validez del Reglamento que el Secretario del Trabajo adoptó para definir los "ejecutivos, profesionales y administradores" que no se consideran obreros o empleados a tenor con la Ley núm. 379 de 1948 y la Ley núm. 289 de 1946. Véase el escolio núm. 4, supra.

(⁶) Este artículo en lo esencial establece:

"Por el transcurso de tres años prescriben las acciones para el cumplimiento de las obligaciones siguientes:

".         .         .         .         .

"(3) La de pagar a los menestrales, criados y jornaleros el importe de sus servicios, y de los suministros o desembolsos que hubiesen hecho, concernientes a los mismos.

".         .         .         .         .

"El tiempo para la prescripción de las acciones a que se refieren los tres párrafos anteriores se contará desde que dejaron de prestarse los respectivos servicios."

La sec. 32 de la nueva Ley de Salario Mínimo de 1956 (29 L.P.R.A. Sup. Acum. 1958, sec. 246 d) altera los términos de prescripción para las acciones en reclamación de salarios ". . . al amparo de esta ley, de los decretos mandatorios ya aprobados o que se aprueben de acuerdo con sus disposiciones, de las órdenes promulgadas por la Junta, o al amparo de cualquier contrato o ley." Pero no se aplica a este caso porque en el inciso (e) se dispone que ". . . lo dispuesto en esta sección en nada afectará los casos ya radicados en los tribunales o que se radicaren dentro de un año después de entrar en vigor esta ley." El texto completo de la sec. 32 dice como sigue:

debe contarse desde la fecha en que por motivo de cambios sustanciales en la naturaleza de los servicios, se opera una novación que extingue el contrato anterior para dar paso a un nuevo contrato, sin tener en cuenta el hecho de que el obrero continúe al servicio del mismo patrono.   A ese fin es imprescindible considerar todos los términos y condiciones del empleo: la tarea realizada, los deberes, las obligaciones, la compensación devengada, etcétera. *Muñoz* v. *Corte,* 63 D.P.R. 236 (1944); *Avellanet* v. *Porto Rican Express Co.,* 64 D.P.R. 693 (1945); *Jiménez* v. *Corte,* 65 D.P.R. 37 (1945); *Valiente & Cía.* v. *Corte,* 68 D.P.R. 529 (1948); *Chabrán* v. *Bull Insular Line,* 69 D.P.R. 269 (1948); *Vicenty* v. *Corona Brewing Corporation,* 73 D.P.R. 135 (1952); *Peña* v. *Eastern Sugar Associates,* 75 D.P.R. 304 (1953); *Lebrón* v. *P. R. Ry., Lt. & P. Co.,* 78 D.P.R. 683 (1955); *Olazagasti* v. *Eastern Sugar Associates,* 79 D.P.R. 93 (1956) y *Berríos* v. *Eastern Sugar Associates,* 79 D.P.R. 688 (1956).

El tribunal sentenciador no formuló conclusiones de hecho sobre cuáles eran los términos y condiciones del empleo de Castellar mientras éste desempeñaba el cargo de "superintendente" de la Hacienda Buena Vista.   Se limitó a

"(a) Por el transcurso de tres años prescribirá la acción en reclamación de salarios que pueda tener un empleado contra su patrono al amparo de esta ley, de los decretos mandatorios ya aprobados o que se aprueben de acuerdo con sus disposiciones, de las órdenes promulgadas por la Junta, o al amparo de cualquier contrato o ley.   Para la prescripción de esta acción el tiempo se contará desde que el empleado cesó en su empleo con el patrono.

"(b) Cuando el empleado estuviere trabajando con el patrono, la reclamación solamente incluirá los salarios a que tuviere derecho el empleado, por cualquier concepto, durante los últimos diez años anteriores a la fecha en que estableciere la acción judicial.

"(c) En el caso de que el empleado hubiere cesado en su empleo con el patrono, la reclamación solamente incluirá los últimos diez años anteriores a la fecha de su cesantía.

"(d) En relación con el término prescriptivo provisto en esta Sección, un cambio en la naturaleza de las labores del empleado no constituirá una novación del contrato de empleo.

"(e) Lo dispuesto en esta Sección en nada afectará los casos ya radicados en los tribunales o que se radicaren dentro de un (1) año después de entrar en vigor esta ley."

consignar meras generalidades: a saber, (1) que "desde el día 28 de abril de 1949 hasta el día 8 de abril de 1953, el demandante continuó trabajando para la demandada bajo el mismo contrato anterior de servicios, pero ocupando el cargo de superintendente de la Hacienda Buena Vista . . ."; y (2) que "Castellar trabajó para la demandada . . . ininterrumpidamente y bajo un solo contrato de servicios desde el día 9 de julio de 1942 hasta el 8 de abril de 1953 en que fue despedido de su empleo, con excepción de dos semanas . . . en que estuvo ausente de su trabajo por motivo de enfermedad." Sin embargo, en sus conclusiones de derecho hizo constar lo siguiente: "De abril 28 de 1949 hasta el 15 de enero de 1952 el demandante estuvo excluído de las Leyes, Decretos y Reglamentos de Horas y Salarios de P. R. por ser un 'ejecutivo' de acuerdo con la regla establecida en *Correa* v. *Mercado*, 72 D.P.R. 84." Esto parecería indicar que hubo un cambio sustancial y efectivo en el trabajo que realizaba Castellar cuando éste dejó de ser "listero" y pasó a ocupar el cargo de "superintendente" de la Hacienda Buena Vista, ya que la doctrina sentada en el caso de *Correa* sólo se aplica a los mayordomos que tienen bajo sus órdenes, dirigen, supervisan, emplean y despiden a otros obreros que trabajan en las fincas de caña de azúcar. Pero esta inferencia se desvanece al considerar la siguiente conclusión de derecho que *prima facie* es inconsistente con la que hemos señalado anteriormente: "Habiendo prestado el demandante servicios ininterrumpidos para la demandada desde el 9 de julio de 1942 hasta el 8 de abril de 1953, bajo un solo contrato de servicios y *no habiéndose demostrado que el status de 'ejecutivo' adquirido por el obrero en el período comprendido entre abril 29 de 1949 a enero 15 de 1952 variara fundamentalmente sus funciones como empleado o modificara o revocara sustancialmente el convenio contractual celebrado entre las partes,* concluímos que la reclamación no está prescrita toda vez que el querellante dejó de prestar sus servicios al patrono en 8 de abril

de 1953 y de ahí en adelante tenía tres años para entablar la reclamación." (Bastardillas nuestras.)

Téngase en cuenta además que la prueba presentada por las partes, sobre las cuestiones de hecho que suscita la defensa de prescripción, fue en extremo contradictoria y antagónica. No es necesario resumirla aquí. Basta señalar, por ejemplo, que siete testigos de la demandada declararon que las funciones de Castellar como "superintendente" de la Hacienda Buena Vista eran las de un *mayordomo*. Atestiguaron que éste tenía facultad para contratar y para despedir a otros trabajadores, que dirigía las labores agrícolas de otros empleados, que tenía específicamente a un listero bajo sus órdenes, y que era el encargado de supervisar todos los trabajos que se hacían en la finca. Sin embargo, el propio demandante declaró que siempre realizó las tareas de un listero, aún cuando pasó a trabajar a Buena Vista con el título de "superintendente". Y hay prueba testifical y documental que, de merecerle crédito al juzgador, podría demostrar: (1) que los mayordomos de la demandada no figuraban en las nóminas ni en los "partes diarios", pero a Castellar se le incluía en los mismos cuando ocupaba el cargo de superintendente en la Hacienda Buena Vista; (2) que los mayordomos cobraban mensual o quincenalmente, mientras que Castellar cobró siempre por semanas; (3) que sólo los listeros firmaban los "partes diarios" y Castellar aparece firmando los mismos durante el período en que trabajó como superintendente; y (4) que Castellar devengaba $20 mensuales como listero antes del 28 de abril de 1949 y continuó recibiendo la misma compensación como superintendente hasta el 21 de enero de 1953, poco tiempo antes del despido.

Así pues, la determinación de los hechos que son esenciales para resolver la cuestión de prescripción depende en este caso de un juicio sobre la credibilidad de los testigos y sobre el valor o eficacia de sus testimonios. Evidentemente el juez sentenciador está en mejor posición que este Tribunal para aquilatar en conjunto la prueba oral y determinar el

efecto, si alguno, de la prueba documental admitida. La situación sería distinta si la prueba documental por sí sola bastara para formar juicio sobre los hechos en controversia. Pero en el caso de autos resulta imprescindible "distinguir" la calidad de los testimonios orales—es decir, apreciar su trivialidad, excelencia, verosimilitud o falsedad. Esto no depende únicamente del tenor literal de las declaraciones. En el récord ante nos se omiten o están desdibujadas las reacciones de los testigos en el curso de los interrogatorios: sus gestos, tonos de voz, expresiones, actitudes, titubeos, ademanes de convicción o duda, etcétera. Estos son elementos de juicio "fugaces e intangibles" que sólo puede captar el juez de instancia, mediante su especial intuición y perspicacia, porque percibe directamente todo lo que hacen y dicen los testigos. Véanse *Orvis* v. *Higgins*, 180 F.2d 537 (2d Cir. 1950); *Wolff* v. *Hernández*, 76 D.P.R. 650, 659–61 (1954), y *Carrión* v. *Tesorero de P. R.*, 79 D.P.R. 371, 384–86 (1956). En todo caso, sin saber cuáles fueron los hechos que el tribunal de instancia estimó probados, resulta imposible resolver en grado de apelación o de revisión la cuestión de derecho suscitada por la defensa de prescripción. Dadas las circunstancias que aquí concurren, en verdad no tenemos una clara comprensión del pronunciamiento que hizo el tribunal a quo desestimando la defensa de prescripción. Como señalamos anteriormente, no sólo se omitieron conclusiones de hecho imprescindibles, sino que también hay en la sentencia dos conclusiones de derecho que *prima facie* son contradictorias.

En consecuencia, sin escape ni remisión, hay que devolver el caso al tribunal sentenciador para que éste haga constar los hechos que estimó probados y dicte el fallo que a su juicio corresponda sobre la cuestión de prescripción. Véanse *American Surety Co.* v. *Izquierdo*, 75 D.P.R. 260 (1953); *Pueblo* v. *Sucn. Ramírez*, 73 D.P.R. 39 (1952); *Defendini* v. *Sucn. Pérez*, 73 D.P.R. 505 (1952) y los casos allí citados. Cf. además *Fogle* v. *General Credit*, 110 F.2d 128 (D. C. Cir. 1940); *Owen* v. *Commercial Union Fire Ins. Co. of New*

*York,* 211 F.2d 488 (4th Cir., 1954) ; y 5 Moore, *Federal Practice* (2a ed.) sec. 52.06. Al dictar nueva sentencia el Tribunal Superior sólo debe considerar las cuestiones de hecho y de derecho que suscita la defensa de prescripción invocada por la demandada. El pronunciamiento de que Castellar se convirtió en un "ejecutivo" cuando empezó a trabajar como superintendente de la Hacienda Buena Vista, según la doctrina sentada en el caso de *Correa,* supra, no puede alterarse a los fines de conceder compensación al demandante por el período comprendido entre el 28 de abril de 1949 y el 15 de enero de 1952. Esto es así porque el demandante no apeló de la sentencia que originalmente dictó el Tribunal Superior en este caso. Sin embargo, el tribunal a quo queda en libertad de reexaminar *todas* sus conclusiones de derecho con miras a resolver la cuestión de prescripción planteada.

██ Los demás errores señalados apenas ameritan discusión. A tenor con las disposiciones del art. 13 de la Ley núm. 379 de 1948 (29 L.P.R.A. sec. 282) y del art. 25 de la Ley de Salario Mínimo de 1941 (29 L.P.R.A. sec. 236), es incuestionable que la demandada debe pagar al demandante, por concepto de penalidad o liquidación de daños, una cantidad igual al total de los salarios adeudados por horas extras trabajadas en exceso de ocho durante cualquier período de 24 horas o durante el día de descanso semanal provisto en la Ley núm. 289 de 1946 (29 L.P.R.A. secs. 295–299). Véanse *Tulier* v. *Autoridad de Tierras,* 70 D.P.R. 267 (1949) ; *Peña* v. *Eastern Sugar Associates,* 75 D.P.R. 304 (1953) ; *Acosta* v. *Floor Coverings Co.,* 78 D.P.R. 490 (1955) ; *Encarnación* v. *Jordán,* 78 D.P.R. 505 (1955) ; *Olazagasti* v. *Eastern Sugar Associates,* 79 D.P.R. 93 (1956) y *Berríos* v. *Eastern Sugar Associates,* 79 D.P.R. 688 (1956).[7] Por último,

---

[7] La Ley núm. 379 de 1948 dejó en vigor en todos sus términos el Decreto núm. 3. *Caguas Bus Line* v. *Sierra,* 73 D.P.R. 743 (1952). Naturalmente, esto no significa que todas las disposiciones de la referida ley son inaplicables a los trabajadores en la industria azucarera. Véanse los casos de *Peña, Olazagasti* y *Berríos,* supra. La "liquidación de daños" provista en el art. 13 de la Ley núm. 379 se aplica a toda reclamación por "compen-

nos parece frívolo impugnar las conclusiones de hecho que formuló el Tribunal Superior respecto al número de horas extras trabajadas por Castellar al servicio de la demandada. Nada hay en los autos que pueda servir de base para afirmar que dichas conclusiones de hecho, basadas en testimonio oral, son manifiestamente erróneas. De conformidad con la Regla 43.1 de Procedimiento Civil (que corresponde a la antigua Regla 52 de las de Enjuiciamiento Civil): "No podemos dejar sin efecto dichas determinaciones, basadas en el testimonio oral que tuvo ante su consideración el tribunal sentenciador, a menos que las mismas sean claramente erróneas. O dicho mejor, apenas reflexionamos un poco, nos topamos con esta norma flexible que es preciso aplicar siempre con estricta lealtad: toda vez que la adecuación entre la prueba y las determinaciones de hecho no es ni puede ser nunca exacta o matemática y, según las circunstancias de cada caso, será más o menos ajustada, más o menos rigurosa, lo único que podemos exigir al tribunal sentenciador es que se mantenga dentro de unos ciertos límites más allá de los cuales no podría hablarse propiamente de adecuación, siquiera fuera laxa, sino de discordancia o error manifiesto." *Carrión* v. *Tesorero de P. R.*, 79 D.P.R. 371, 385–386 (1956). Véanse además: *Mar-*

---

sación menor a la fijada en esta Ley para horas regulares y horas extras de trabajo". (Leyes de 1948, págs. 1255, 1263; 29 L.P.R.A. sec. 282.) Y los incisos (e) y (f) del art. 4 de esa Ley disponen que son horas extras de trabajo: (1) "Las horas que un empleado trabaja para su patrono durante el día de descanso que se haya fijado o se fijare por ley en el caso de industrias y negocios que no están sujetos al cierre de su establecimiento;" y (2) "Las horas que el empleado trabaja para su patrono en exceso del máximo de horas de labor al día que la Junta de Salario Mínimo haya fijado o fijare para la ocupación, negocio o industria en cuestión". Dicho en otros términos, el citado art. 4 incorpora todas las disposiciones sobre horas extras del Decreto núm. 3 y también lo dispuesto en la Ley núm. 289 de 1946 sobre el día de descanso. De modo que la liquidación de daños y perjuicios provista en el art. 13 de la Ley núm. 379 de 1948, se aplica a toda reclamación por horas extras bajo el referido Decreto y por trabajo realizado durante el día de descanso bajo la Ley núm. 289 de 1946. Ya hemos resuelto que procede esa "penalidad" aún cuando la reclamación se refiera a períodos de labor anteriores a la fecha de vigencia de la cláusula sobre liquidación de daños y perjuicios. Véase *Tulier* v. *Autoridad de Tierras*, 70 D.P.R. 267 (1949).

*tín* v. *Torres*, 79 D.P.R. 391 (1956); *Ochoa* v. *Cía. Ron Carioca*, 79 D.P.R. 861 (1957) y *Orozco* v. *Estado Libre Asociado*, 80 D.P.R. 607 (1958).

*Se deja sin efecto la sentencia y se devuelve el caso al tribunal de instancia para ulteriores procedimientos que sean compatibles con esta opinión.*

Los Jueces Presidente Sr. Negrón Fernández y Asociado Sr. Belaval, no intervinieron.